# PATTEN *v.* WARNER.

CONTRACTS; MUTUALITY; TRUSTS AND TRUSTEES; STATUTE OF LIMITATIONS IN EQUITY; ATTORNEY AND CLIENT.

1. To create a binding contract the minds of the parties must meet in a contractual relation.

2. The mere reposing of confidence does not create a trust cognizable in equity or convert into a trustee the person in whom confidence has been reposed; but the assent, express or implied, of the person sought to be placed in such fiduciary relation, or where a trust has been devolved in consequence of privity of estate, or for any other reason, the assent of the person from whom such trust has been derived, must be shown in order to charge such person as a trustee.

3. The statute of limitations is equally a bar in equity as at common law in a case where there is concurrent jurisdiction, as in a suit for an accounting; *following* Sis *v.* Boarman, *ante,* p. 116.

4. The knowledge of an attorney, whether communicated to his clients or not, in a given case, *held* to bind his clients.

No. 665. Submitted April 29, 1897. Decided May 25, 1897.

HEARING on an appeal by the complainants from a decree dismissing a bill in equity for an accounting. *Affirmed.*

The COURT in its opinion stated the case as follows:

The appellants, Josephine A. Patten, Mary E. Patten, Edythe A. Patten and Helen Patten, were, during the earlier months of the year 1889, the owners, as tenants in common, of a four-fifths interest in a certain piece of real estate on F street, in the city of Washington. Their married sister, Mrs. Augusta Glover, with whom and with whose husband their relations at the time were not entirely friendly, was the owner of the remaining one-fifth interest in the property. The property had been derived to them from their deceased mother; and deeming it desirable that they should hold it all, the complainants wished to purchase the Glover interest. For the reason intimated, however, they

did not wish to communicate directly with the Glovers in regard to it, nor did they even wish it to be known by them that they (the appellants) desired the property. It seems to have been supposed that the Glovers would not sell at all to the complainants, although they might be induced to dispose of the property to other persons. The appellants communicated with their attorney, Mr. Henry E. Davis, on the subject, and Mr. Davis communicated with the appellee, Brainard H. Warner.

The appellee was in the business of dealing in real estate as a member of the firm of B. H. Warner & Co., and was also at that time the president of the Columbia National Bank. That bank held a note given by Mrs. Glover and indorsed by her husband, originally for $5,000 and afterwards curtailed to $3,500, which the appellee had been instrumental in causing the bank to take. There was a question raised as to the validity of that note—mainly, it would seem, on the ground that the maker of it was a married woman, and it was very doubtful whether it had been executed with reference to her separate estate, and also probably because it was not secured by any conveyance of property. How the knowledge of the existence of that note came to the complainants is not entirely clear from the record before us; nor, perhaps, is it important. It seems, however, that they communicated that fact to their attorney, and that Mr. Davis thereupon sought to make it the instrumentality by which he might acquire for his clients the interest in the F street property which they desired to purchase.

Mrs. Glover, in conjunction with some of the complainants, her sisters, had been appointed administratrix of the personal estate of her mother. In order to procure the necessary administration bond, she had executed a deed of trust by way of mortgage of her interest in the estate derived from her mother, the penalty being in a very large amount. From this deed of trust, whether by accident or

design does not appear, her interest in the F street property had been omitted. Mr. Davis suggested to the appellee Warner that he might to some extent secure the note in question by procuring a deed of trust from the Glovers upon the F street property. The suggestion was eagerly accepted. Mr. Davis procured from the land records of the District a description of the property, for which service he received compensation from Warner, and the latter, after much effort, procured the execution by the Glovers, in New York, on September 19, 1889, of the desired deed of trust upon the F street property. The deed purported to secure a promissory note for $5,000, to which figure the loan had been again advanced, or was agreed to be advanced, as a consideration for the execution of the deed. There is some discrepancy in the record, which probably is not important, with regard to the date of this new note. The deed of trust recites it as being the 19th of September, 1889, the same as the date of the deed, while the records of the bank would show it to have been September 23, 1889. It was payable six months after date.

Thus far there is no dispute about the facts, or, at all events, they are satisfactorily proved. But the subsequent transactions and the previous circumstances that led up to them are in controversy, and it is difficult, if not impossible, to reconcile the conflicting statements of the parties, and the testimony adduced by them in support of those statements.

The claim of the complainants, as stated in their bill filed in this cause, is, "that at or about the time of the said advice or information given by said Davis to said Warner, the said Davis informed said Warner that he, said Warner, could, in return for the assistance and advice then given him, secure for the complainants, the said interest of the said Augusta P. Glover in said real estate; and that if he would so do these complainants would purchase the same and would assume and pay the incumbrance which Mrs. Glover should

place thereon to secure the indebtedness aforesaid; . . . that at said time the said Davis cautioned the said Warner not to disclose to Mrs. Glover or her husband that these complainants were the real purchasers of said property, as, if the said Glovers should become aware of the fact that these complainants desired to purchase the said interest in said property, they, the said Glovers, would refuse to sell the same;" and "that thereupon the said Warner assented to said proposition, and undertook and agreed with the said Davis to negotiate with the said Glovers and purchase from them the interest of the said Glovers in the said real estate for the benefit of these complainants."

The appellee, on the other hand, denied that he was in any manner employed as an agent in the business for the appellants, or that there was any such proposition made to him by Mr. Davis or assented to by him; and he averred that he purchased the Glover interest for himself and with his own money, knowing full well, however, that the complainants would purchase from him.

At all events, negotiations were opened between the appellee and the Glovers for the purchase by the former of the F street lot, or the Glover interest in it. It is claimed by the appellants that the appellee broached the matter to Mr. Glover in pursuance of his understanding with Mr. Davis. Mr. Warner intimates, although he is not certain of it, that Mr. Glover broached the matter to him. Presumably, the negotiation, however initiated, was not commenced until after the execution of the deed of trust to secure the note for $5,000; that is, after September 19, 1889. The result of the negotiations was that, on November 16, 1889, an agreement for the purchase of the Glover interest in the F street property was entered into between Warner and the Glovers, and a check of B. H. Warner & Co. for $500, with a memorandum upon it that it was a deposit for the purchase of part of lot 13, in square 290, which was the F street property, was drawn to the order of Mrs. Glover, and apparently sent

to her in New York, where it was deposited in bank for collection. It was paid in Washington on November 21, 1889.

A check of B. H. Warner for $2,000, dated on November 22, 1889, and paid in Washington on November 26, 1889, and a check of B. H. Warner for $3,500, dated on November 23, 1889, and paid in Washington on November 30, 1889, were similarly drawn to the order of Mrs. Glover and deposited by her in New York for collection. On November 30, 1889, the Glover note in the Columbia National Bank for $5,000, with the accrued interest amounting to $50, was paid by check of B. H. Warner for $5,050. Subsequently, two other checks, testified by the appellee to have been given on the same account, one for $200, dated January 25, 1890, and paid in Washington on February 3, 1890, and the other for $44.79, dated February 26, 1890, and paid in Washington on March 17, 1890, were drawn by him to the order of Mrs. Glover, and transmitted to New York.

The sum total of these payments is $11,294.79, and this sum the appellee testifies in this cause to have paid to Mrs. Glover on account of his purchase. But whether this sum was the sum agreed upon in the negotiations, or how it was reached if it was so agreed upon, or why it was divided into the several checks that have been recited, the record does not show, and there is no attempt to explain. It may be inferred that the agreed amount of the purchase money, subject to the deed of trust, was $6,000; for that is the amount of the several checks that were delivered at or about the time, the smaller checks ($200 and $44.79) having evidently been given for some subsequent adjustment of the matter or for some subsequent consideration.

On November 16, 1889, which seems to have been the day on which the agreement was made, as would appear from the memorandum on the check for $500 already mentioned, the Glovers executed and acknowledged in Washington the deed of conveyance of their interest in the F street property to the appellee, Warner. But it is doubtful whether the

deed was then delivered. The inference would rather be that it was not then delivered to the appellee, or that if it was then delivered, it was not to be recorded until the later day; and it was not in fact recorded until November 23, 1889, when the check for $3,500, completing the sum of $6,000 for the interest, was delivered or transmitted by the appellee Warner to Mrs. Glover. This deed recites a merely nominal consideration of ten dollars.

Very soon after the execution of the deed of conveyance by the Glovers to Warner, and very probably either on the day of the actual execution of the deed or on the day of its delivery to him, if those days were different, as they seem to have been, Warner communicated with Davis by telephone; and there were various communications between them on subsequent days. They differ greatly in their testimony as to the purport of these communications; and especially as to the purport of the first communication by telephone. One feature of it, at least, is beyond question; and that is, that Mr. Warner then informed Mr. Davis that he (Warner) had procured the deed, or the title to the property in question, and was prepared to transfer it for $13,000. Mr. Davis testifies that he understood the purport of the communication to be that Mr. Warner had taken the property from the Glovers for $13,000, and was ready to transfer it to the appellants upon the payment or repayment to him of that amount. Mr. Warner's testimony is to the effect that, having secured the title for himself, he was now ready to deal with the purchaser whom Mr. Davis had stated he would produce or procure for him.

Mr. Davis thereupon procured the sum of $13,000 from his clients by means of a promissory note negotiated for them by him with Riggs & Co.; paid that sum to Warner, and received from Warner a deed of conveyance to the appellants, and a deed of release of the deed of trust to secure the $5,000. This transaction must have occurred, according to the testimony of Mr. Davis, on November 30, 1889;

for, although the deed from Warner to the appellants bears date and was executed on the previous day, November 29, the execution of the deed of release was on November 30, and Mr. Davis states that both deeds were delivered to him at the time that he paid the $13,000. Mr. Warner admits, however, that he drew upon this sum of $13,000 in order to pay the Glover note of $5,000.

The deeds were delivered for record and duly recorded, and the transaction was presumed to be at an end. Very soon afterwards, however, during the winter immediately following of 1889–90, the complainants in some way learned, or at all events heard some rumor, to the effect that they had paid more to Warner than he had paid to the Glovers; and there were reports that came to the ears of Warner that he had taken undue advantage of the appellants in the transaction. The affair culminated in a stormy scene at the office of Messrs. Shellabarger & Wilson, where Mr. Shellabarger, Mr. Glover, Mr. Davis and Mr. Warner met in order to probe the matter and to ascertain the source of the rumors. The meeting broke up without satisfactory result. But either at the meeting or in coming away from it—for they differ as to the time, although they agree as to the fact—Mr. Warner stated to Mr. Davis that he (Warner) had undoubtedly made a profit by the transaction, as he considered that he had a right to do. And Mr. Warner claims, and there is testimony tending to show, that he had at least on one previous occasion made a similar statement to Mr. Davis.

Here the matter seems to have rested, so far as the record shows, until September of 1893, when one of the complainants, Miss Josephine Patten, meeting her sister, Mrs. Glover, in New York, was informed by her that Mr. Warner had paid her, not $13,000, but only about $9,000 for the interest which he had purchased from her. And the complainants claim that this was the first positive information which they had, or by reasonable diligence could have had, of the true facts of the case. The next step was to file the bill of com-

plaint in this suit, on June 2, 1894, for discovery and an account, and the recovery from Warner of the difference between the amount paid by him to the Glovers and the sum of $13,000. The defendant Warner denied all the equity of the bill.

After replication filed and testimony taken, the cause came on for hearing; and thereon the court below dismissed the bill. From the decree of dismissal the complainants have appealed to this court.

*Mr. Wm. G. Johnson* for the appellants:

No consideration is essential to establish a confidence between persons nor to redress in equity the abuse of it when it has been established and abused. Nor is any technical relation between the parties essential. It is sufficient that confidence shall be shown to have been reposed by one person in another, in order to invoke the principle of equity for its preservation against abuse. Paley on Agency (3d Am. Ed.), p. 12; 2 Sugden on Vendors (7th Am. Ed.), Sec. 3, Par. 1, p. 362; *Michoud* v. *Girod*, 4 How. 554; Perry on Trusts, Sec. 210; *Brooks* v. *Martin*, 2 Wall. 70; *Rankin* v. *Porter*, 7 Watts, 390; *Smith* v. *Kay*, 7 H. L. 779; *Sheriff* v. *Neal*, 6 Watts, 534; *Wakeman* v. *Dodd*, 27 N. J. Eq. 566–567.

It is not contended that one man may not make a profit out of a transaction with another though he has acquaintance with the private and confidential affairs of that other. But it is contended that where the private affairs of another are voluntarily disclosed under express or implied confidence an abuse of that confidence will not be permitted. There is no room for doubt that the defendant knew he was being admitted into the confidence of the complainants by their counsel, and in their interest, and he was brought within the rule laid down by Lord Eldon, in the leading case on this branch of equity jurisprudence, that—"the language of a court of justice has in all times been, that, if a man does not choose to act upon the confidence, appearing in the course

of the transaction, to be so reposed in him, he ought to reject it as soon as proposed." *Huguenin* v. *Basely,* 14 Ves. Jr. 294. The confidence thus reposed in the defendant was not rejected, but on the contrary was eagerly accepted, though, as appears from his testimony, from no worthy motive. The effect of this was to make him a trustee. *Coates' Appeal,* 2 Pa. St. 133.

*Mr. John B. Larner* and *Mr. A. S. Worthington* for the appellee.

Mr. Justice MORRIS delivered the opinion of the Court:

The main question in this case is one of fact rather than of law. It is whether in the purchase of property that has been mentioned, the appellee should be held to have acted on his own account or as trustee for the appellants.

It is very clear that the appellants cannot justly be held entitled to recover in the suit, except upon the theory, either that there was an express agreement between them and the appellee, whereby the latter agreed to act as their agent in the transaction out of which this controversy has arisen, or else that there was established between them such a fiduciary relation of trust and confidence as should estop and preclude the appellee from claiming to have acted in his own individual right and for his own personal benefit. The bill of complaint is based upon the first of these two alternatives, and alleges, as we have seen, an express agreement between the parties. But in the argument before us, while not wholly abandoning this ground of action, the contention for the complainants seems to be rested mainly upon the second alternative, the alleged existence of fiduciary relations between the parties.

Certainly the record fails to show the existence of any express agreement between the appellants and the appellee. That agreement is alleged in the bill, and denied in the answer; and that denial is emphasized by the appellee in his testimony when called as a witness on his own behalf. The

testimony of Mr. Davis, which alone supports the contention
of the appellants in that regard, shows rather a vague under-
standing on his part of the establishment of some agreement
between himself and the appellee than the existence of any
definite or positive agreement.    Whether it be that the recol-
lection of parties and of witnesses has been dimmed by lapse
of time; or that the mistake was made, not entirely uncom-
mon under such circumstances, of supposing something to
have been done, which it was intended and desired to do,
but which was not actually done; or that so much reliance
was carelessly placed upon the sentiment of honor as that
parties were induced to forego the precautions required by
law for the creation or justification of contracts having ref-
erence to real estate; certain it is that the testimony falls far
short of the requirements of a court of equity in the estab-
lishment of a contract or agreement denied by the answer of
the appellee as defendant in the cause.    The fundamental
element of mutuality was wanting to establish any such con-
tractual relation.    If, after the procurement of the deed of
trust to secure the note for $5,000, the appellee had resolved
to go no farther, and had even informed Mr. Davis that he
would go no farther in the matter, it is difficult to see how,
either in law or in equity, upon the testimony contained in
the record before us, the appellee could be held for a breach
of contract.    If, after the conveyance to him of the property
for the sum of $11,000 or $11,300, or whatever he actually
paid for it, the appellee, assuming that he was the agent of
the appellants, had called upon them to take the property
off his hands at that figure, and they had declined for the
reason that they considered the price excessive, and repu-
diated or denied the existence of any agreement, it is diffi-
cult to see how, upon the testimony before us, a court of
equity could justly have required them to take the property
and to refund to the appellee the sum paid by him for it.
And if, in the absence of proof of express agreement, and in
the absence of any memorandum whatever in writing, and

in the absence of any understanding of any kind in regard to the price and terms of purchase, the complainants would not, under such circumstances, be constrained to take the property, then most undoubtedly no converse duty to convey to them could be imposed upon the appellee.

It is a singular fact that throughout this whole transaction, so far as the record shows, there was never mention at any time of the price which the appellants were willing to pay for the property until after the appellee had procured the title for himself; nor was there even the remotest allusion to that exceedingly important circumstance. And certainly it can not be that the appellants intended to bind themselves irrevocably to pay to the appellee any sum for the property which he might consider it worth and might choose to pay for it. On the other hand, if they did not so bind themselves, there was no valid contract at all; for, as we have said, the essential element of mutuality was wanting.

It is quite evident that, in the most favorable view that we can take of the case of the appellants, too much was left to inference, and the minds of the parties never actually met in contractual relation.

But if express contract was absent in this case, the record equally fails to disclose the existence of any such fiduciary relation between the parties as would justify the conclusion that the appellee should be held as a trustee for the appellants.

Confidence and trust are said to be synonymous; and it is claimed that one who confides in another and whose confidence is accepted by that other and acted on by him, is entitled to assume that undue advantage will not be taken of the trust so reposed. Various authorities are cited in support of this proposition. As, for instance, in the case of *Coates' Appeal,* 2 Pa. St. 133, the Supreme Court of Pennsylvania said :

"The word *confidence,* be it remarked, is a word peculiarly

appropriate to create a trust. It is as applicable to the subject of a trust, as nearly a synonym as the English language is capable of. *Trust* is a confidence which one man reposes in another, and confidence is a trust."

The same court also said in the case of *Rankin* v. *Porter*, 7 Watts, 390: "The ground of the decision is that, whereever confidence has been reposed, justice forbids that it shall be abused; and it applies as strongly to those who have gratuitously or officiously undertaken the management of another's property as to those who are retained and paid for it. The man who offers his services to a distant owner, who promises to examine the property and ascertain the price which can be obtained for it, and especially if he proposes to do this from friendship, must not expect to gain from imposing on the confidence he has excited."

Perhaps the idea is still more broadly and sweepingly stated by one of the judges in the case of *Smith* v. *Kay*, 7 H. L. 779, when he said : "The principle applies to every case where influence is acquired and abused, where confidence is reposed and betrayed."

All this is undoubtedly the dictate of honor and of true morality; and perhaps it is to be wished that courts of equity could enforce the doctrine to the extreme limit to which by a literal construction of its terms it might be held to extend. But we well know that, although a court of equity is a court of conscience, not everything binding upon the conscience, not everything binding upon the sense of honor, can be enforced in a court of equity. Not every trust and confidence is there cognizable. On the contrary, it is daily experience, especially in matters connected with dealings in real estate, that trust and confidence are often abused beyond the limits within which a court of equity can intervene. We should not seek unduly to circumscribe and limit the functions of a court of equity in such matters; it is in the interest of justice that they should be allowed the broadest possible sphere of operation. And

yet we are not warranted in extending that sphere to the limit claimed in the present case.

It is the result of an examination of all the cases that the mere reposing of confidence does not of itself create a trust, or convert into a trustee the person in whom confidence has been reposed; but that the relation of trust must first, or perhaps simultaneously, be created, and thereupon the confidence reposed. Otherwise, it would be in the power of any one, by his voluntary, unsolicited, officious, and perhaps undesirable act, to convert another into a trustee for him, and thereby perhaps most unjustly to tie his hands. A confidential communication to a stranger, who occupies no fiduciary relation whatever to the person confiding in him, cannot create a trust. Neither can a trust be created by a confidential communication made to him in the hope or expectation that he will assume such fiduciary relation and he does not actually agree to assume it. The assent, express or implied, of the person sought to be placed in such fiduciary relation, or where a trust has been devolved in consequence of privity of estate or for any other reason, the assent of the person from whom such trust has been derived, would seem to be involved in all cases. (See 1 Leading Cases in Equity, p. 62, and notes.) We think that the mere reposing of confidence, without the assent, express or implied, of the person in whom the confidence is reposed, to act in a fiduciary capacity towards the person who confides in him, does not create a trust cognizable in equity, however dishonorable the violation of such confidence may be from the standpoint of the moralist. And if it be argued that in this case there was an agreement on the part of the appellee to hold such fiduciary relation towards the appellants, that merely brings us back again to the first question—whether there was any agreement between the parties—a question to which the record has compelled a negative answer.

But whatever may be the substantial merits of this case, it is very clear to us that there is one consideration which

must dispose of it adversely to the appellants. The suit is for an accounting. It is a case where there is concurrent jurisdiction at common law and in equity. A plea of the statute of limitations would undoubtedly be a bar to the demand at common law. This statute must be equally held in equity as a bar to this proceeding. See *Sis* v. *Boarman,* *ante,* p. 116.

It is sought to escape from this conclusion by an attempt to show that the appellee's alleged fraud upon the rights of the appellants was not discovered by the latter until September of 1893, and that they instituted their suit in due time thereafter. But they had as much accurate knowledge in 1889 or 1890 as they acquired in 1893. It is of no consequence, perhaps, that Mrs. Glover was strangely mistaken in 1893 as to the amount of money paid to her for the property by the appellee in 1889. The substantial fact which she then communicated to the appellants was, that there was a considerable difference between the amount paid to her by the appellee and the amount which the appellee demanded and received from the complainants. Their attorney had this same knowledge in 1889 or 1890; for there can be no doubt whatever that he was then informed by the appellee, that he (the appellee) had made a profit in the transaction, and he then and there offered to tell him the precise amount of his profit. Mr. Davis at the time was the general attorney of the appellants; he had been their attorney specially in this whole transaction with the appellee; he had even been specially charged by them to ascertain what profit, if any, the appellee had made; for there is testimony tending to show that very soon after the consummation of the transaction their suspicions on this point were aroused. The knowledge of Mr. Davis, under the circumstances, whether communicated to them or not, and the knowledge which he readily might have acquired from the appellee, who offered to disclose to him the amount of his profits, must be imputed to the appellants. There is

no reason whatever why this bill filed in 1894 might not equally well have been filed in 1890. The luck of memory and the indistinctness of recollection which now characterizes the testimony, might then perhaps have been avoided. We are compelled to conclude that the suit now comes too late.

It follows that the decree appealed from must be *affirmed*, *with costs. And it is so ordered.*